**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Riverside Engineering Incorporated, | No. CV-23-02465-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Gemini Insurance Company, | |
| Defendant. | |

In 2018, Riverside Engineering Incorporated ("Riverside") entered into a purchase agreement with non-party MetalX, LLC ("MetalX") to provide MetalX with a Model M-88 SHD Shredder ("Shredder"). In 2020, after a series of Shredder malfunctions, MetalX filed a demand for arbitration against Riverside. Riverside, in turn, filed a claim with its insurance provider, Gemini Insurance Company ("Gemini"), seeking to invoke Gemini's duty to defend under the parties' insurance policy. Gemini declined to defend Riverside. Riverside then filed a demand for arbitration against Gemini. In October 2023, the arbitration panel granted summary judgment in favor of Gemini, finding that Gemini did not have a duty to defend Riverside. Riverside then brought this action against Gemini and moved to vacate the arbitration award. (Doc. 2.) Gemini, in turn, moved to confirm the arbitration award. (Doc. 15.)

For the reasons that follow, Riverside's motion to vacate the arbitration award is denied and Gemini's cross-motion to confirm the arbitration award is granted.

…

**BACKGROUND**

I.      Relevant Factual Background

      A.      **The Riverside-MetalX Dispute**

On March 2, 2018, Riverside and MetalX entered into a purchase agreement ("Purchase Agreement") for the Shredder to be installed at MetalX's facility. (Doc. 4-1 at 211-43.)   The Purchase Agreement provided for arbitration of "a dispute arising in connection with this Agreement."  (*Id.* at 217.)   The section entitled "Warranties and Liability for Defective Equipment" provided in relevant part that Riverside "warrants for the period of eighteen (18) months from the date of delivery . . . that the Equipment will be free from defects of every kind and nature in material, design and workmanship (including latent defects). . . .   [MetalX] shall, upon discovery of such defects or nonconformities, notify [Riverside], and [Riverside] shall promptly correct such defects or nonconformities. . . .   [I]f [MetalX's] limited remedy fails of its essential purpose, [MetalX] shall have all of its remedies as provided by law." (*Id.* at 214-15, emphasis omitted.)

Beginning in February 2019, the Shredder began to malfunction. (*Id.* at 195-201.) After the first malfunction, Riverside and Quad Plus, LLC ("Quad Plus"), the company that designed the motors for the Shredder, disclaimed any further responsibility, thus imposing the repair costs on MetalX. (*Id.* at 196-98.)

On December 11, 2020, MetalX filed a demand for arbitration against Riverside (the "Demand"). (*Id.* at 194-209.)  In the section of the Demand entitled "Defects," MetalX described three "major motor event[s]" and other malfunctions involving the Shredder: (1) in February 2019, one of the Shredder's motors (the "East Motor") failed, "MetalX immediately notified Riverside of the East Motor failure," and Quad Plus and Riverside (defined together in the Demand as the "Riverside Team") "informed MetalX that the failure was a rare case of bad windings"; (2) in May 2019, the East Motor failed (as did the drive cabinet), MetalX notified the Riverside Team, and "[t]he Riverside Team refused to accept responsibility for the failure"; and (3) on August 20, 2019, the other Shredder motor

(the "West Motor") failed, MetalX notified the Riverside Team, and "the Riverside Team refused to provide warranty coverage." (*Id.* at 195-98.) The Demand asserted three claims against Riverside: Count I, breach of warranty; Count II, negligent planning, designing, and engineering; and Count III, breach of contract. (*Id.* at 204-08.)

B.     **The Gemini Insurance Policy**

On May 20, 2020, Riverside entered into a contract with Gemini for the provision of insurance (the "Policy"). (*Id.* at 34-86.) The Policy covered the period from June 1, 2020 to June 1, 2021 (the "Policy Period") and referred to Riverside as the "Insured" and Gemini as the "Company." (*Id.* at 34.) The Policy provided, in relevant part, that:

> **B.     Defense.** As part of and subject to the Limits of Liability, the **Company** shall have the right and duty to defend, any **Claim** against the Insured, to which this Policy applies, even if any of the allegations of the **Claim** are groundless, false, or fraudulent. However, the **Company** shall have no duty to defend any Claim, and may withdraw from the defense of any **Claim**, after the applicable Limits of Liability have been exhausted by **Damages** and/or **Claim Expenses**.

(*Id.* at 37, emphases in original.) The Policy also defined various bolded terms, including:

> **E.     "Claim"** means a demand received by the **Insured** for money or services and alleging a **Wrongful Act**, including the service of suit or institution of arbitration, mediation or other formal alternative dispute resolution proceeding. **Claim** shall not include a demand for equitable, non-pecuniary or injunctive relief or for legal fees or expenses in connection therewith.
>
> . . . .
>
> **O.     "Professional Services"** means only those services the **Insured** is legally qualified to perform for others in the **Insured's** capacity as an architect, engineer, land surveyor, landscape architect, construction manager, interior designer, land planner, space planner, expert witness, scientist or technical consultant with respect to the foregoing listed services.
>
> . . . .
>
> **T.     "Wrongful Act"** means any actual or alleged negligent act, error or omission committed or attempted solely in the performance of or

1   failure to perform **Professional Services** by an **Insured** or by any
2   other person for whose acts the **Named Insured** is legally liable.

3   (*Id.* at 38-41, emphases in original.)

4   The section entitled "Limits of Liability" provided in relevant part that:

5   **E.**   **Multiple Insureds, Claims and Claimants.**  The inclusion herein of
6   more than one **Insured** shall not operate to increase the **Company's**
    Limits of Liability.  **Claims** alleging, based upon, arising out of or
7   attributable to the same or related **Wrongful Act(s)** shall be treated as
8   a single **Claim** regardless of whether made against one or more than
    one **Insured**.  All such **Claims**, whenever made, shall be considered
9   first made at the date of the earliest of such **Claims**, and if that date
10  falls within the **Policy Period**, the Automatic Extended Reporting
    Period, or Optional Extended Reporting Period, if purchased, in which
11  the earliest **Claim** arising out of such **Wrongful Act(s)** was first
12  made, all such **Claims** shall be subject to the Limits of Liability and
    retention set forth in such Policy.

13

14  (*Id.* at 46, emphases in original.)

15  The Policy also included a "Discovery Clause":

16  **B.**   **Discovery Clause.**  If during the **Policy Period** any **Insured** first
17  becomes aware or has reasonable grounds to suspect that an **Insured**
    has committed or may have committed a **Wrongful Act** for which
18  coverage is otherwise provided hereunder, and provided the **Insured**
19  during the **Policy Period** gives notice to the **Company** of:

20  **1.** a description of the anticipated **Wrongful Act** that may be alleged;

21  **2.** the nature of the potential injury, monetary or non-monetary
22  damages which could result from such anticipated **Wrongful Act**; and

23  **3.** the circumstances by which the **Insured** first became aware of or
    suspected such anticipated **Wrongful Act**;
24

25  then any **Claim** that may subsequently be made against any **Insured**
    arising out of such anticipated **Wrongful Act** shall be deemed for the
26  purposes of this insurance to have been made during the **Policy
27  Period**.

28  (*Id.* at 47, emphases in original.)

1      The Policy also included a "Design/Build Endorsement," which described certain

2    exclusions from the Policy for the performance of "Professional Services and construction,

3    erection, fabrication, installation, assembly, manufacture, or the supply of equipment or

4    materials incorporated therein." (*Id.* at 76, emphasis omitted.)

5          C.      **The Riverside-Gemini Arbitration**

6          On July 27, 2020, Riverside filed a claim under the Policy seeking a defense and

7    coverage from Gemini for the events outlined in the Demand. (Doc. 16-2 at 162.)

8          On January 26, 2021, Gemini sent Riverside a letter stating "that Gemini has no

9    duty to defend or indemnify [Riverside] for this matter." (Doc. 16-9 at 16-27.)

10         On March 26, 2021, Riverside asked Gemini to reconsider. (*Id.* at 29 [Gemini's

11   counsel describing the letter].)

12         On April 23, 2021, Gemini rejected Riverside's request for reconsideration. (*Id.* at

13   29-35.)

14         On June 2, 2021, Riverside initiated an arbitration proceeding against Gemini to

15   challenge Gemini's failure to defend and indemnify. (Doc. 2 at 6.) "The Parties agreed to

16   bifurcate the proceeding into a Phase I wherein the Panel would determine whether Gemini

17   had a duty to defend, and then, if needed, a Phase II where the Panel would adjudicate

18   whether Gemini owes indemnity to Riverside. In Phase I, the Parties filed cross-motions

19   for summary judgment regarding the duty to defend." (Doc. 4-1 at 2 ¶ 5.)

20         On May 17, 2023, the arbitration panel held oral argument on the parties' cross-

21   motions for summary judgment. (Doc. 16-16 at 39-77.)

22         On October 23, 2023, two members of the arbitration panel (the "Majority") granted

23   summary judgment in favor of Gemini, concluding that Gemini did not have a duty to

24   defend Riverside (the "Award"). (Doc. 4-1 at 2-12; *id.* at 13-15 [concurrence]; *id.* at 16-

25   32 [dissent].)

26         …

27         …

28         …

II.     Procedural History

On November 27, 2023, Riverside initiated this action by filing the complaint. (Doc. 1.)

That same day, Riverside filed the pending motion to vacate the arbitration award (Doc. 2) and a declaration from Daniel G. Murphy (Doc. 4).

On January 19, 2024, Gemini filed a combined response and cross-motion to confirm the arbitration award (Doc. 15) and a declaration from Nathan M. Rymer (Doc. 16).

On February 2, 2024, Riverside filed a combined reply in support of its motion to vacate and response to Gemini's cross-motion to confirm.  (Doc. 19.)

On February 9, 2024, Gemini filed a reply in support of its cross-motion to confirm. (Doc. 20.)

Neither side requested oral argument.

**DISCUSSION**

I.      Legal Standard

The Federal Arbitration Act ("FAA") provides that a party to an arbitration may apply for an order confirming the arbitration award, and "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of [the FAA]."  9 U.S.C. § 9.  "The burden of establishing grounds for vacating an arbitration award is on the party seeking it."  *U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010).

Section 10 "of the FAA provides the exclusive means by which a court reviewing an arbitration award under the FAA may grant vacatur of a final arbitration award."  *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 664 (9th Cir. 2012).  Vacatur is permitted only:

(1)     where the award was procured by corruption, fraud, or undue means;

(2)     where there was evident partiality or corruption in the arbitrators, or either of them;

(3)     where the arbitrators were guilty of misconduct in refusing to

postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)    where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  Here, the sole provision on which Riverside relies is § 10(a)(4).  (Doc. 2 at 3.)

As the Ninth Circuit has explained, "[a]rbitrators exceed their powers" for purposes of § 10(a)(4) only "when they express a 'manifest disregard of law,' or when they issue an award that is 'completely irrational.'"  *Bosack v. Soward*, 586 F.3d 1096, 1104 (9th Cir. 2009) (citations omitted).  "[T]o rise to the level of manifest disregard the governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable."  *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879-80 (9th Cir. 2007) (cleaned up).

Section § 10(a)(4) creates "a high standard for vacatur. . . .  It is not enough to show that the arbitrator committed an error–or even a serious error.  This extremely limited review authority is designed to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures."  *HayDay Farms, Inc. v. FeeDx Holdings, Inc.*, 55 F.4th 1232, 1240 (9th Cir. 2022) (cleaned up).  "Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award under the FAA."  *Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162, 1166 (9th Cir. 2019) (cleaned up).  An arbitration panel's award demands deference because "[b]road judicial review of arbitration decisions could well jeopardize the very benefits of arbitration, rendering informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process."  *Kyocera Corp. v. Prudential-Bache Trade Servs.*, 341 F.3d 987, 998 (9th Cir. 2003) (en banc).

…

1

II.      The Arbitration Award

2

A.      **The Majority's Award**

3

The Majority explained that Texas law applied to the dispute and that "Texas

4

follows the eight-corners rule to analyze whether a duty to defend under an insurance

5

policy exists.  The eight corners rule provides that the analysis of whether there is a duty

6

to defend is limited to a review of [the] four corners of the policy and the four corners of

7

the operative complaint."  (Doc. 4-1 at 3 ¶ 11, citation omitted.)  Thus, the Majority

8

explained that its "decision is derived from its analysis of the Demand and the Policy" and

9

found it unnecessary to refer to extrinsic evidence. (*Id.* at 3 ¶ 13.)  The Majority also stated

10

that under Texas law, "Riverside bears the initial burden to prove there is a potentially

11

covered claim under a liability policy." (*Id.* at 3 ¶ 9.)  The Majority also "pa[id] deference

12

to the duty to defend under Texas law, wherein *inter alia* all ambiguities and disputed

13

issues of fact are resolved in favor of the duty."  (*Id.* at 3 ¶ 10.)

14

As an initial matter, the Majority concluded that "[t]he Design-Build Endorsement

15

only applies when Riverside performs both the designing and building functions for a given

16

project. . . .  Reading the Policy as a cohesive whole, the Majority finds that the Design-

17

Build Endorsement does not preclude cover for projects where Riverside only performs

18

design or engineering services."  (*Id.* at 8 ¶ 31.)

19

Evaluating the Policy's language, the Majority stated that "as the [P]olicy is a claims

20

made and reported policy, Riverside must report any such Claim in the policy period in

21

which it is first made by MetalX in order to have coverage."  (*Id.* at 3 ¶ 9.)  The Majority

22

also stated that these requirements were "consistent with Texas law wherein a demand that

23

creates a potential liability is considered a claim for a wrongful act."  (*Id.* at 9 ¶ 36.)

24

The Majority found the following factual allegations in the Demand instructive:

25

21.      In May 2019, the second major motor event occurred.  The East Motor
          and the drive cabinet both failed, resulting in an explosion.  The motor
          and the drive cabinet each needed to be removed and rebuilt offsite.

26

27

28

22.      MetalX notified the Riverside Team of the failures and explosion.
          The Riverside Team refused to accept responsibility for the failure.

- 8 -

1
2
3

> The Riverside Team made it clear that they would not provide any warranty coverage for this or any future motor or drive cabinet failures. All future services provided by Quad Plus would be billed to MetalX at its standard rates.

4
5
6

> 23.   The Riverside Team blamed this second major failure on the conditions within the MetalX building, claiming that hydrogen sulfide gas emitted from the well water (which MetalX used for cooling purposes) created a caustic environment within the building.

7
8
9

> 24.   Riverside and Quad Plus were both aware of these conditions during the initial commissioning of the Shredder, but neither advised MetalX at that time that measures would need to be taken to improve the environment for the Shredder to function properly.

10
11
12

> 25.   Per the recommendations of the Riverside Team, MetalX incurred significant expense to reconfigure its cooling system to eliminate hydrogen sulfide gasses in the structure that housed the Shredder motors.

13
14

(*Id.* at 9 ¶ 37, quoting Doc. 4-1 at 197 ¶¶ 21-25.)

15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Majority "[found] that the recommendations Riverside made in relation to the shredder's operating conditions were design activities requiring the knowledge and expertise of professionals, such as Riverside." (*Id.* at 9 ¶ 38.) The Majority further found that "[t]he Demand contains allegations that all of the purported defects and nonconformities of the Shredder were noticed to Riverside upon discovery of same by MetalX; that Riverside refused responsibility for said defects; and, that Riverside failed to correct the alleged defects and nonconformities." (*Id.* at 10 ¶ 39, internal citations omitted.) Accordingly, the Majority determined that "[s]ince . . . the facts pled *inter alia* at Demand ¶¶ 22-25 allege design issues that Riverside knew of and made recommendations about, Riverside was on notice of same before the Policy incepted." (*Id.* at 10 ¶ 40.) The Majority independently analyzed Count II as requested by Riverside, concluding that "MetalX expressly alleged that the background facts and the facts of the warranty claim in Count I formed part of, and are related to, the negligence claim in Count II. As such, accepting MetalX's allegations without regard to their truth or falsity, the

1   Majority finds that Count II is related to the warranty demands first made in 2019, which

2   the Majority finds should have been noticed to Gemini." (*Id.* at 10-11 ¶ 42.)

3        Based on this analysis, the Majority concluded that "[w]ithin the four corners of the

4   Demand, MetalX made three Claims set forth at Counts I, II and III" that arose before the

5   Policy Period, and accordingly, "Gemini does not owe Riverside a duty to defend." (*Id.* at

6   10-11 ¶¶ 41-43.)

7        **B.    The Parties' Arguments**

8        Riverside seeks vacatur of the Award under 9 U.S.C. § 10(a)(4). (Doc. 2 at 3-4.)

9   More specifically, Riverside argues that "Texas law prohibits the Majority from

10  interpreting the allegations as it did" because "[t]he Majority drew at least two prohibited

11  inferences from these allegations. First, it inferred that the 'Riverside Team' meant

12  'Riverside.' The Demand makes clear that is not necessarily the case. The Riverside Team

13  is Riverside or Quad Plus. . . . Second, the Majority inferred that the recommendations by

14  the 'Riverside Team' to modify MetalX's facility were design activities under the Policy,

15  and therefore sufficient to put Riverside on notice of a potential Wrongful Act." (*Id.* at 10-

16  11.) Riverside also argues "that the law requires [the Majority] to resolve any ambiguities

17  or disputed issues in favor of Riverside and the duty to defend, but [it] did the opposite."

18  (*Id.* at 12, internal citations omitted.) In reliance on *Pacific Motor Trucking Company v.*

19  *Automotive Machinists Union*, 702 F.2d 176 (9th Cir. 1983), and *Aspic Engineering and*

20  *Construction Company v. ECC Centcom Constructors LLC*, 913 F.3d 1162 (9th Cir. 2019),

21  Riverside argues that the Majority acted irrationally because "the Majority recognized that

22  the critical terms of Gemini's claims-made insurance policy, required the assertion of a

23  Claim. The Majority, however, did not find that a Claim, as defined under the Policy, was

24  asserted by MetalX." (Doc. 2 at 12-13, citation omitted.) Riverside argues that the

25  Majority could not have found a Claim because "[n]othing in the MetalX Demand indicates

26  that MetalX asserted a prior Claim based on Shredder design errors. Instead, the Majority

27  relied on its own intuition that knowledge of *any* design-related issues, including those

28  only pertaining to MetalX's building, meant Riverside had knowledge of a possible

1   Wrongful Act." (*Id.* at 13, emphasis in original.) Riverside also argues that the Majority

2   improperly interpreted the Discovery Clause "to find that a failure to notify Gemini of

3   potential Wrongful Acts, even absent a Claim, destroys coverage." (*Id.* at 13-14, emphasis

4   in original.)

5        Gemini responds that "[t]he Majority did not ignore essential Policy terms or draw

6   any prohibited inferences in manifest disregard of the law." (Doc. 15 at 7, emphasis

7   omitted.) According to Gemini, "[t]he Majority found that MetalX's allegations that

8   MetalX made three separate warranty demands against Riverside in February, May, and

9   August of 2019, each constituted a demand for services, and put Riverside on notice of

10  facts that would include professional, design-related claims." (*Id.* at 8, 10-11.) Gemini

11  also contends that "the MetalX Demand specifically defines the 'Riverside Team' as

12  including both Riverside and Quad Plus." (*Id.* at 9.) Further, Gemini contends that

13  Riverside "ignores the Majority's written findings, including its statement that MetalX's

14  three warranty demands in 2019 were a 'Claim' alleging a 'Wrongful Act' as defined in

15  the Policy." (*Id.*) Gemini contends that *Pacific Motor* and *Aspic Engineering* are

16  distinguishable because "[u]nlike the arbitrator in *Aspic* (who essentially stated on the face

17  of the record that he would ignore a federal law that was part of the contract merely because

18  he believed it would be 'unjust' to enforce the law), and the arbitrator in *Pacific Motor*

19  (who fashioned his decision to align with his own personal beliefs as to what would be a

20  fair outcome while intentionally ignoring the contract terms), the Majority did not disregard

21  any relevant laws, pleading allegations, or Policy terms." (*Id.* at 13.)[1]

22       In reply, Riverside argues that "[n]owhere in its brief does Gemini argue that the

23  Majority correctly inferred that Riverside engaged in design activities when recommending

24  MetalX fix the facility MetalX designed and constructed. Without this inference, the

25  ───────────────
    [1]      Gemini also contends that "[t]he Majority did not err in finding that the
26  Design/Build Endorsement precluded coverage. While the Majority did not discuss this
    issue in any significant detail, because they found the claims-made issue to be
27  determinative, the dissent makes clear that the Majority found that coverage would also be
    precluded by this Endorsement." (*Id.* at 14.) Riverside replies that "[t]he Majority never
28  found that the Design-Build Endorsement precludes coverage as Gemini claims." (Doc.
    19 at 7.) These arguments are not relevant to the analysis below.

- 11 -

1    Award cannot stand." (Doc. 19 at 3.) Riverside argues that "[a]t most, the allegations

2    support an inference that Riverside was on notice of MetalX's negligence in designing its

3    facility. But this, of course, is a far cry from notice of a Wrongful Act *by Riverside*." (*Id.*

4    at 4, emphasis in original.) Riverside also contends that Gemini's citations to the record

5    do not support "that the Majority found that 'a Claim was first made prior to the Policy

6    period in 2019 when MetalX asserted three separate warranty claims.'" (*Id.* at 4-5, citation

7    and internal quotation marks omitted.)

8         In reply, Gemini elaborates upon some of the arguments made in its response and

9    cross-motion. (Doc. 20 at 2-7.) Gemini also argues that "[c]ontrary to Riverside's

10   argument, there is nothing in the Majority's findings requiring notice to Gemini before a

11   'Claim' is made." (*Id.* at 5.)

12        C.    **Analysis**

13        In a nutshell, Riverside argues that vacatur of the Award is warranted because

14   (1) the Majority manifestly disregarded Texas law when it drew improper inferences from

15   the Demand, and (2) the Majority acted completely irrationally when it ignored essential

16   terms of the Policy and incorrectly interpreted the Discovery Clause.

17        1.    Manifest Disregard

18        "Manifest disregard requires something beyond and different from a mere error in

19   the law or failure on the part of the arbitrators to understand and apply the law." *HayDay*

20   *Farms*, 55 F.4th at 1240 (cleaned up). "To demonstrate manifest disregard, the moving

21   party must show that the arbitrator understood and correctly stated the law, but proceeded

22   to disregard the same." *Bosack*, 586 F.3d at 1104 (cleaned up). "[E]ven misstatements of

23   the law followed by erroneous application of the law do not provide grounds upon which

24   a reviewing court may vacate an arbitral award under the FAA." *Biller*, 668 F.3d at 668

25   n.7. "[M]anifest disregard of the law for the purposes of the FAA occurs only where there

26   is evidence that the Arbitrator knew the law but ignored it nonetheless." *Id.* Arguing that

27   an arbitrator "misunderstood the law and misapplied it" does not supply sufficient grounds

28   for vacatur. *Id.* Moreover, reviewing courts "have no authority to re-weigh the evidence."

1    *Bosack*, 586 F.3d at 1105 (citation and quotation marks omitted).

2            As an initial matter, Riverside does not point to any evidence in the record that the

3    Majority *intentionally* disregarded Texas law.  *Bosack*, 586 F.3d at 1104.  The Majority

4    acknowledged that Texas law governed the interpretation of the Policy and that "Texas

5    follows the eight-corners rule to analyze whether a duty to defend under an insurance

6    policy exists," which limits review to the "four corners of the policy and the four corners

7    of the operative complaint." (Doc. 4-1 at 3 ¶ 11, citing *Monroe Guaranty Ins. Co. v. BITCO*

8    *General Ins. Co.*, 640 S.W.3d 195 (Tex. 2022).)  The Majority also acknowledged that "all

9    ambiguities and disputed issues of fact are resolved in favor of the duty."  (*Id.* at 3 ¶ 10.)

10   The Majority then stated that its "decision is derived from its analysis of the Demand and

11   the Policy."  (*Id.* at 3 ¶ 13.)  The Majority made factual findings from its review of the

12   Demand: "The Riverside Team blamed this second major failure on the conditions within

13   the MetalX building . . . .  Riverside and Quad Plus were both aware of these conditions

14   during the initial commissioning of the Shredder, but neither advised MetalX at that time

15   that measures would need to be taken to improve the environment for the Shredder to

16   function properly."   (*Id.* at 9 ¶ 37.)   Even if the Majority reached this conclusion

17   erroneously, that would not demonstrate that the Majority exhibited the sort of manifest

18   disregard of the law required by § 10(a)(4).  *Bosack*, 586 F.3d at 1102 ("Neither erroneous

19   legal conclusions nor unsubstantiated factual findings justify federal court review of an

20   arbitral award under the statute, which is unambiguous in this regard.") (citation and

21   quotation marks omitted).

22           For similar reasons, Riverside is not entitled to vacatur based on its argument that

23   the Majority improperly inferred that the "Riverside Team" meant Riverside.  The Demand

24   defines "Riverside Team" to include Riverside and QuadPlus.  (Doc. 4-1 at 196 ¶ 14.)

25   Thus, the Majority's reference to Riverside receiving notice of the Shredder failures—

26   when the Demand states that MetalX notified the "Riverside Team"—is not a forbidden

27   inference displaying a manifest disregard for the law, but rather the Majority simply

28   attempting to do what was required of it under Texas law, basing its analysis on a review

1    of the four corners of the Demand.  At a minimum, there is no evidence that the Majority

2    believed that reaching this inference was impermissible under Texas law yet proceeded

3    despite that knowledge.

4         Riverside's second argument—that there was "no basis to conclude that Riverside

5    must have suspected it committed a Wrongful Act (negligently designing the Shredder)

6    from the fact that Riverside (and/or Quad Plus) determined MetalX had negligently

7    designed its facility" (Doc. 12 at 2)—also lacks merit.  This argument essentially amounts

8    to an invitation for the Court to review the Majority's factual findings as to whether

9    Riverside had knowledge of a Wrongful Act.  But as the Ninth Circuit has made clear,

10   doing so would exceed the scope of permissible review under § 10(a)(4).  *Bosack*, 586 F.3d

11   at 1105 (reviewing courts "have no authority to re-weigh the evidence") (citation and

12   quotation marks omitted); *Rappaport v. Fed. Sav. Bank*, 2021 WL 3841879, *3 (D. Ariz.

13   2021) ("At bottom, then, Defendants' true gripe appears to be with the Arbitrator's factual

14   determination that Rappaport never disclaimed his intention to take such leave.  But as the

15   Ninth Circuit has made emphatically clear, a district court may not vacate an arbitral award

16   due to 'unsubstantiated factual findings.'") (citation omitted).  Even if the Majority's

17   finding that Riverside had knowledge of a Wrongful Act was erroneous, vacatur would not

18   be appropriate.  *Bosack*, 586 F.3d at 1105 ("Whether or not the panel's findings are

19   supported by the evidence in the record is beyond the scope of our review.").  "The risk

20   that arbitrators may construe the governing law imperfectly in the course of delivering a

21   decision that attempts in good faith to interpret the relevant law, or may make errors with

22   respect to the evidence on which they base their rulings, is a risk that every party to

23   arbitration assumes, and such legal and factual errors lie far outside the category of conduct

24   embraced by § 10(a)(4)."  *Kyocera Corp.*, 341 F.3d at 1003.

25              2.    Completely Irrational

26        "An award is completely irrational only where the arbitration decision fails to draw

27   its essence from the agreement.  An arbitration award draws its essence from the agreement

28   if the award is derived from the agreement, viewed in light of the agreement's language

1    and context, as well as other indications of the parties' intentions.  Under this standard of

2    review, we decide only whether the arbitrator's decision draws its essence from the

3    contract, not the rightness or wrongness of the arbitrator's contract interpretation." *Aspic*

4    *Eng'g*, 913 F.3d at 1166 (cleaned up).  "[E]ven if the panel erred by making contradictory

5    findings of fact, this does not render the decision completely irrational." *Bosack*, 586 F.3d

6    at 1106-07.  "[A]n arbitrator does not exceed its authority if the decision is a plausible

7    interpretation of the arbitration contract.  Accordingly, the court must defer to the

8    arbitrator's decision as long as the arbitrator even arguably construed or applied the

9    contract." *HayDay Farms*, 55 F.4th at 1241 (cleaned up).  "What an arbitrator may not do,

10   however, is disregard contract provisions to achieve a desired result." *Aspic Eng'g*, 913

11   F.3d at 1167.

12           Riverside's argument that the Majority did not find, and could not have found, that

13   MetalX asserted a Claim because Riverside did not have knowledge of a Wrongful Act

14   amounts to a request for the Court to review the Majority's interpretation of the facts.  But

15   as explained above, "[i]t is not within the province of this Court to substitute its judgment

16   for that of an experienced arbitrator." *Sunfed Produce, LLC v. Vega-Tostado*, 2017 WL

17   4876467, *2 (D. Ariz. 2017).  Even assuming the Majority erred by finding that Riverside

18   had knowledge of a Wrongful Act, it is not the Court's place to review the Majority's

19   findings.  *Bosack*, 586 F.3d at 1106 (reviewing courts do "not [determine] whether the

20   panel's findings of fact are correct or internally consistent"); *Am. Postal Workers Union*

21   *AFL-CIO v. U.S. Postal Serv.*, 682 F.2d 1280, 1285 (9th Cir. 1982) ("An arbitrator's award

22   will not be vacated because of erroneous findings of fact or misinterpretations of law.").

23           In the alternative, Riverside argues that even if it was on notice of a Wrongful Act

24   before the Policy Period, that "is not the same as finding that MetalX asserted a prior

25   Claim," and the Majority improperly relied on the Discovery Clause "to find that a failure

26   to notify Gemini of potential Wrongful Acts, even absent a Claim, destroys coverage."

27   (Doc. 2 at 13-14, citation omitted.)  This argument fares no better than the others.  The

28   Majority found that "[w]ithin the four corners of the Demand, MetalX made three Claims

1    set forth at Counts I, II and III." (Doc. 4-1 at 10 ¶ 41.)  Riverside takes issue with this

2    finding, but again, the Court has no license to engage in additional factfinding or review

3    the correctness of the Majority's factual findings.  *Bosack*, 586 F.3d at 1106.

4            *Pacific Motor* and *Aspic Engineering* do not compel a different result.  In *Pacific*

5    *Motor*, the Ninth Circuit upheld the district court's vacatur of an arbitration award because

6    "[t]he arbitrator disregarded a specific contract provision to correct what he perceived as

7    an injustice.  Although an arbitrator has great freedom in determining an award, he may

8    not 'dispense his own brand of industrial justice.'"  702 F.2d at 177.  There, the contract at

9    issue specified "that the company could select Working Foremen without regard to

10   seniority" and "[t]he arbitrator acknowledged that this section gave the company discretion

11   over the Working Foreman position.  Nonetheless, he ruled that the company could not

12   demote Turner from Working Foreman because to do so would be 'unreasonable and

13   unconscionable' in light of the 'incredibly long' time Turner had held the job."  *Id.*

14   Similarly, in *Aspic Engineering*, the Ninth Circuit upheld the district court's vacatur of an

15   arbitration award because "[t]he Award disregarded specific provisions of the plain text in

16   an effort to prevent what the Arbitrator deemed an unfair result.  Such an award is

17   'irrational.'"  913 F.3d at 1168.

18           This case is not remotely similar.  The Majority did not intentionally disregard

19   specific provisions of the Policy in an effort to achieve a result that accorded with its own

20   notions of justice.  To the contrary, the Majority considered the Policy, identified key terms

21   (Doc. 4-1 at 4 ¶ 17), and concluded based on that review that "Riverside must report any

22   such Claim in the policy period in which it is first made by MetalX in order to have

23   coverage" (*id.* at 3 ¶ 9).  The Majority further concluded that "[w]ithin the four corners of

24   the Demand, MetalX made three Claims set forth at Counts I, II and III" that arose before

25   the Policy Period.  (*Id.* at 10-11 ¶¶ 41-42.)  Although the Majority did not specifically

26   attribute the allegations in the Demand to the defined terms "Wrongful Act" or

27   "Professional Services," the Majority's reasoning, evaluated as a whole, draws its essence

28   from the Policy's terms—for example, the Majority explained that "the Parties concur that

negligence in the design of the Shredder is alleged in the Demand" (*id.* at 8 ¶ 32); that "the recommendations Riverside made in relation to the shredder's operating conditions were design activities requiring the knowledge and expertise of professionals" (*id.* at 9 ¶ 38); and that "the facts alleged by MetalX—specifically, the allegations that the May 2019 shredder problems occurred because of a design-related issue of which Riverside was aware and failed to mitigate prior to the Policy period— . . . gave Riverside notice of potential professional liability" (*id.* at 10 ¶ 39). That analysis is not completely irrational in the manner that § 10(a)(4) requires. *Cf. Holsum Bakery Inc. v. Bakery, Confectionary, Tobacco Workers & Grain Millers, Loc. 232*, 699 F. App'x 690, 691 (9th Cir. 2017) ("Because the arbitrator interpreted and applied the CBA in reaching these conclusions, the award, even if incorrect, drew its essence from the agreement.").

III.     Attorneys' Fees And Costs

        A.     **The Parties' Arguments**

Gemini argues, in reliance on *International Union of Petroleum & Industrial Workers v. Western Industrial Maintenance, Inc.*, 707 F.2d 425 (9th Cir. 1983), and § 37.009 of the Texas Civil Practice and Remedies Code, that it "is entitled to recover its reasonable and necessary attorney's fees and costs expended in seeking confirmation of the Final Award and opposing Riverside's Motion." (Doc. 15 at 15-16.)

Riverside responds that "*International Union* . . . is inapposite. Riverside has not failed to abide by the Award or any obligation imposed by it." (Doc. 19 at 8.) Additionally, in reliance on *Holsum Bakery*, Riverside argues that "[t]he Ninth Circuit has made clear that merely seeking judicial review of an arbitrator's award is not an unjustified refusal to abide by the award such that an award of fees would be warranted." (*Id.* at 8-9.) Finally, Riverside argues that Gemini "cannot obtain fees under the" cited Texas statute because "[t]his is a proceeding under the FAA for vacatur of the Award, not an action for declaratory relief under" Texas law and "courts have repeatedly held that the [Texas statute] is a procedural statute which does not apply to proceedings in Federal court." (*Id.* at 9.)

1    In reply, Gemini argues that "[f]ederal courts in diversity actions allow parties to

2   recover attorney's fees under state declaratory judgment statutes when it is authorized by

3   substantive state law. . . .  The [Texas statute] authorizes an award of attorney's fees when

4   it is 'equitable and just.' . . .  [I]t is equitable and just to award Gemini its reasonable and

5   necessary attorney's fees and costs incurred in these Court proceedings."  (Doc. 20 at 7.)

6   Gemini also argues that "*International* makes clear that a party's behavior in court

7   proceedings, including the initiation of a groundless action such as Riverside's, can support

8   a finding of bad faith warranting the imposition of attorney's fees."  (*Id.* at 7-8.)  Finally,

9   Gemini argues that *Holsum Bakery* "does not preclude the recovery of attorney's fees in a

10  case where a party unjustifiably seeks to vacate or opposes confirmation of an arbitration

11  award."  (*Id.* at 8.)

12       B.       **Analysis**

13       Gemini's request for an award of attorneys' fees and costs is denied.  Although

14  Gemini is correct that a district court may, pursuant to its inherent authority, order a party

15  that has unsuccessfully sought vacatur of an arbitration award to pay the attorneys' fees

16  and costs of its adversary, such an award is permissible only when the losing party "acted

17  in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Int'l Union of Petroleum*

18  *& Indus. Workers*, 707 F.2d at 428 (citation omitted).[2]  The Ninth Circuit has thus declined

19  to award fees against a losing party whose "arguments [for vacatur] were not frivolous."

20  *Holsum Bakery*, 699 F. App'x at 691 (cleaned up).  Here, although Riverside did not

21  ultimately succeed in its attempt to satisfy § 10(a)(4)'s exacting standard for vacatur, the

22  vacatur arguments that Riverside advanced were not frivolous or indicative of bad faith.

23  *Cf. C.W. v. Capistrano Unified Sch. Dist.*, 784 F.3d 1237, 1245 (9th Cir. 2015) ("In

24

25  [2]     This is not, to be clear, a standard that is unique to cases involving requests for
    vacatur or confirmation of an arbitration award.  Rather, it represents one manifestation of
26  the "inherent power in the courts to allow attorneys' fees in particular situations, unless
    forbidden by Congress."  *Alyeska Pipeline Serv., Co. v. Wilderness Soc'y*, 421 U.S. 240,
27  258-59 (1975).  *See also Int'l Union of Petroleum & Indus. Workers*, 707 F.2d at 428
    (identifying this standard as an exception to "the American rule, [under which] absent
28  contractual or statutory authorization, a prevailing litigant ordinarily may not collect
    attorneys' fees").

1    considering what constitutes a claim that is frivolous, unreasonable or groundless, it is
2    important that a district court resist the understandable temptation to engage in *post hoc*
3    reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must
4    have been unreasonable or without foundation.") (cleaned up).

5           Nor is Gemini entitled to an award of attorneys' fees and costs under § 37.009 of
6    the Texas Civil Practice and Remedies Code.  As an initial matter, the Court is skeptical
7    that § 37.009 even potentially authorizes a fee award here, where both sides' claims for
8    relief in this Court were premised on the FAA (as opposed to being premised on the Texas
9    courts' statutory authority to issue declaratory relief).  Nevertheless, even assuming that
10   fees are potentially available under § 37.009, that statute merely vests courts with
11   discretionary authority to "award costs and reasonable and necessary attorney's fees as are
12   equitable and just."  *Id.*  Because, as noted in the previous paragraph, Riverside's
13   arguments for vacatur were not frivolous or indicative of bad faith, the Court concludes in
14   its discretion that an award of attorneys' fees would not be equitable and just.  *See, e.g.*,
15   *Basley v. Adoni Holdings, LLC*, 373 S.W.3d 577, 587 n.16 (Tex. Ct. App. 2012) ("A
16   prevailing party in a declaratory judgment action is not entitled to attorney's fees simply
17   as a matter of law; entitlement depends on what is equitable and just, and the trial court's
18   power is, in that respect, discretionary.") (citation and quotation marks omitted); *Robinson
19   v. Budget Rent-A-Car Systems, Inc.*, 51 S.W.3d 425, 433 (Tex. Ct. App. 2001) ("[T]he
20   statute affords the trial court a measure of discretion in deciding whether to award
21   attorney's fees.  As such, the trial court's decision concerning the grant or denial of an
22   award of attorney's fees will not be reversed on appeal absent a clear showing of an abuse
23   of discretion.  In its findings of fact and conclusions of law, the court stated that both parties
24   had legitimate positions, arguments, and rights to pursue.  The court also determined the
25   Appraiser was a public official bringing this suit in good faith . . . .  Therefore, we conclude
26   there was no abuse of discretion by the trial court in denying attorney's fees under section
27   37.009 of the Texas Civil Practice and Remedies Code.") (citations omitted).
28           …

1       Accordingly,

2       **IT IS ORDERED** that:

3       1.     Riverside's motion to vacate the arbitration award (Doc. 2) is **denied**.

4       2.     Gemini's cross-motion to confirm the arbitration award (Doc. 15) is **granted**.

5       3.     The Clerk shall enter judgment accordingly and terminate this action.

6       Dated this 12th day of September, 2024.

Dominic W. Lanza
United States District Judge